United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ERIC LA VON THRASHER,                )    No. 05-1840 SBA (PR)
                                     )
            Petitioner,              )    **ORDER DENYING PETITION**
      v.                             )    **FOR WRIT OF HABEAS**
                                     )    **CORPUS**
JILL BROWN, Acting Warden,           )
                                     )
            Respondent.              )
_____)

**INTRODUCTION**

Petitioner, an inmate at San Quentin State Prison (hereinafter "SQSP"), filed this pro se action seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The matter is now submitted for the Court's consideration of the merits of the petition. For the reasons discussed below, the petition is DENIED.

**PROCEDURAL BACKGROUND**

Petitioner was convicted in the San Diego County Superior Court for two counts of first-degree murder, one count of kidnapping and one count of second-degree burglary with enhancements. (Resp't Ex. 1 at 1.) He was sentenced to life in prison with minimum eligible parole eligibility of seven years. The present petition does not challenge Petitioner's underlying conviction. Rather, it challenges the denial of his parole suitability by the Board of Prison Terms (hereinafter "BPT") in 2002.[1]

On October 16, 2002, at Petitioner's seventeenth parole hearing, the BPT denied Petitioner parole. (Resp't Ex. 4.) The BPT's determination was based on the circumstances of Petitioner's commitment offense, his May 23, 2002 psychological report, and opposition to parole made by the Deputy District Attorney and the next of kin of one of the victims. (Id.)

Petitioner sought habeas relief in state court. On December 26, 2003, the Marin County

_____

[1] The BPT was abolished on July 1, 2005 and replaced with the Board of Parole Hearings. See CAL. GOV. CODE § 12838.4. The Court will continue to use "BPT" to denote the past actions of the Board of Parole Hearings, the real party in interest.

Superior Court denied Petitioner's state habeas petition because it did not find that the BPT had abused its discretion in considering Petitioner's suitability for parole.[2]  (Resp't Ex. 2.)  The California Supreme Court summarily denied his state habeas petition on March 30, 2005.  (Pet'r Ex. C.)

On May 4, 2005, Petitioner filed the instant petition (docket no. 1).  On December 12, 2005, the Court issued an order to show cause (docket no. 2).  On February 7, 2006, Respondent filed an Answer (docket no. 3).  On March 9, 2006, Petitioner filed a Traverse (docket no. 4).  The Court will proceed to consider the merits of Petitioner's due process claim relating to the BPT's 2002 parole denial.

**STANDARD OF REVIEW**

**I.    AEDPA**

Under the Antiterrorism and Effective Death Penalty Act (hereinafter "AEDPA"), a district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  A state court has "adjudicated" a petitioner's constitutional claim "on the merits" for purposes of § 2254(d) when it has decided the petitioner's right to post-conviction relief on the basis of the substance of the constitutional claim advanced, rather than denying the claim on the basis of a procedural or other rule precluding state court review on the merits.  Lambert v. Blodgett, 393 F.3d 943, 969 (9th Cir. 2004), cert. denied, 546 U.S. 963 (2005).  It is error for a federal court to review de novo a claim that was adjudicated on the merits in state court.  See Price v. Vincent, 538 U.S. 634, 638-43 (2003).

_____

[2] The Superior Court's order incorrectly indicated the date of Petitioner's parole hearing as October 16, 2003 instead of October 16, 2002.  (Resp't Ex. 2. at 1:20, 2:20.)

United States District Court

For the Northern District of California

**A.** **Review of Parole Suitability Decisions**

Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole.  See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006); Rosas v. Nielsen, 428 F.3d 1229, 1232 (9th Cir. 2005) (per curiam); see also McQuillion v. Duncan, 306 F.3d 895, 901 (9th Cir. 2002) (assuming without deciding that AEDPA deferential standard of review under § 2254 applies to such decisions).

**B.** **Section 2254(d)(1)**

Challenges to purely legal questions resolved by the state court are reviewed under § 2254(d)(1), under which a state prisoner may obtain habeas relief with respect to a claim adjudicated on the merits in state court only if the state court adjudication resulted in a decision that was "contrary to" or "involved an unreasonable application of" "clearly established Federal law, as determined by the Supreme Court of the United States."  Williams (Terry) v. Taylor, 529 U.S. 362, 402-04, 409 (2000).  While the "contrary to" and "unreasonable application" clauses have independent meaning, see id. at 404-05, they often overlap, which may necessitate examining a petitioner's allegations against both standards.  See Van Tran v. Lindsey, 212 F.3d 1143, 1149-50 (9th Cir. 2000), overruled on other grounds; Lockyer v. Andrade, 538 U.S. 63, 70-73 (2003).

**1.** **Clearly Established Federal Law**

"Clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  Williams, 529 U.S. at 412.  "Section 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence."  Id.  "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous."  Mitchell v. Esparza, 540 U.S. 12, 17 (2003).  If there is no Supreme Court precedent that controls on the legal issue raised by a petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly-established federal law.  See, e.g., Stevenson v. Lewis, 384 F.3d 1069, 1071 (9th Cir. 2004).

The fact that Supreme Court law sets forth a fact-intensive inquiry to determine whether

3

constitutional rights were violated "obviates neither the clarity of the rule nor the extent to which the rule must be seen as 'established'" by the Supreme Court. <u>Williams</u>, 529 U.S. at 391. There are, however, areas in which the Supreme Court has not established a clear or consistent path for courts to follow in determining whether a particular event violates a constitutional right; in such an area, it may be that only the general principle can be regarded as "clearly established." <u>Andrade</u>, 538 U.S. at 64-65. When only the general principle is clearly established, it is the only law amenable to the "contrary to" or "unreasonable application of" framework. <u>See id.</u> at 73.

Circuit decisions may still be relevant as persuasive authority to determine whether a particular state court holding is an "unreasonable application" of Supreme Court precedent or to assess what law is "clearly established." <u>Clark v. Murphy</u>, 331 F.3d 1062, 1070-71 (9th Cir.), <u>cert. denied</u>, 540 U.S. 968 (2003); <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 600 (9th Cir. 1999).

## 2. "Contrary to"

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 413. A "run-of-the-mill state-court decision" that correctly identifies the controlling Supreme Court framework and applies it to the facts of a prisoner's case "would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." <u>Williams</u>, 529 U.S. at 406. Such a case should be analyzed under the "unreasonable application" prong of § 2254(d). <u>See Weighall v. Middle</u>, 215 F.3d 1058, 1062 (9th Cir. 2000).

## 3. "Unreasonable Application"

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u>, 529 U.S. at 413.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." <u>Id.</u> at 411; <u>accord</u>

4

Middleton v. McNeil, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application of governing federal law must be not only erroneous, but objectively unreasonable); Woodford v. Visciotti, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to "incorrect" application of law).

Evaluating whether a rule application was unreasonable requires considering the relevant rule's specificity; if a legal rule is specific, the range of reasonable judgment may be narrow; if it is more general, the state courts have more leeway.  Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).  Whether the state court's decision was unreasonable must be assessed in light of the record that court had before it.  Holland v. Jackson, 542 U.S. 649, 651 (2004) (per curiam).

The "objectively unreasonable" standard is not a clear error standard.  Andrade, 538 U.S. at 75-76 (rejecting Van Tran's use of "clear error" standard); Clark, 331 F.3d at 1067-69 (acknowledging the overruling of Van Tran on this point).  After Andrade, "[t]he writ may not issue simply because, in our determination, a state court's application of federal law was erroneous, clearly or otherwise.  While the 'objectively unreasonable' standard is not self-explanatory, at a minimum it denotes a greater degree of deference to the state courts than [the Ninth Circuit] ha[s] previously afforded them."  Id.  In examining whether the state court decision was unreasonable, the inquiry may require analysis of the state court's method as well as its result.  Nunes v. Mueller, 350 F.3d 1045, 1054 (9th Cir. 2003).

**C.**    **Section 2254(d)(2)**

A federal habeas court may grant the writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  An unreasonable determination of the facts occurs where the state court fails to consider and weigh highly probative, relevant evidence, central to the petitioner's claim, that was properly presented and made part of the state court record.  Taylor v. Maddox, 366 F.3d 992, 1005 (9th Cir. 2004).  A district court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C.

**United States District Court**
For the Northern District of California

1   § 2254(e)(1).

2   **II.**   <u>**Exhaustion**</u>

3       Prisoners in state custody who wish to challenge collaterally in federal habeas corpus

4   proceedings either the fact or length of their confinement are required first to exhaust state judicial

5   remedies, either on direct appeal or through collateral proceedings, by presenting the highest state

6   court available with a fair opportunity to rule on the merits of each and every claim they seek to

7   raise in federal court.  <u>See</u> 28 U.S.C. § 2254(b), (c); <u>Granberry v. Greer</u>, 481 U.S. 129, 133-34

8   (1987).  It is undisputed that Petitioner exhausted his state court remedies as to the claims raised in

9   his federal petition.

10                          **FACTUAL BACKGROUND**

11      Although Petitioner is not challenging the validity of his underlying criminal conviction, the

12  facts regarding the commitment offense were relied upon by the BPT to deny Petitioner parole in

13  2002.  The facts regarding the circumstances surrounding the offense were read into the record at the

14  hearing.  The Court includes that summary here:

15

16          [O]n June 16th of 1971, Thrasher had intended to rob Anthony's Fish Grotto
            in La Mesa, California.  He knew that the 64-year-old female victim, Diane
17          Northrup, was the manager of the establishment.  He apparently broke into
            Mrs. Northrup's house to wait for her to return home.  While waiting, a
18          neighbor, the 70 year old female victim Freda Hopper . . . entered the house
            after placing a paper bag on the porch of Mrs. Northrup's home.  Mrs. Hopper
19          attempted to retreat when she observed Thrasher in the house.  He then shot
            her in the hip and in the stomach before she could get out the door.  Seeing
20          she was alive, he got a pillow and placed it under [her] head and shot her in
            the head with the nine-millimeter pistol.  Reports indicate that Thrasher then
21          went to the home of his brother-in-law, William Bush, and told him that he
            had just killed a woman.  When it got dark on the same evening, Thrasher
22          returned to Mrs. Northrup's residence and entered the residence with a key
            taken from Mrs. Hopper.
23

24          After his arrest, Thrasher confessed to the police to the killing of the victims
            Hopper and Northrup.  Thrasher indicated that after returning to Mrs.
25          Northrup's residence, he waited and confronted her in her residence as she
            entered.  Thrasher and Mrs. Northrup returned in her vehicle to Anthony's
26          Fish Grotto where Thrasher reportedly robbed the establishment of $2,412
            dollars.  Thrasher then shot Mrs. Northrup in the head three times as she sat in
27          her vehicle.

28          Thrasher was arrested at approximately 12:15 a.m. on June 17th of 1971,

                                   6

**United States District Court**
For the Northern District of California

wearing an Army uniform and was a passenger in a vehicle being driven by his 18-year-old sister.  Twenty minutes after Thrasher's arrest, the vehicle and the body of Mrs. Northrup was discovered.  Mrs. Northrup was slumped behind the wheel of her vehicle.  Thrasher subsequently directed officers to an alleyway where the murder weapon was found.

And then the prisoner's version as it is spelled out in the 2002 Board report is that Thrasher continues to accept responsibility for the crime and emphasizing that he was 17 years of age at the time and approached life from the standpoint of getting whatever he wanted.  He indicates that the details surrounding the offense are accurately documented in the existing data and he states that he is remorseful and realizes that he cannot change what has occurred.

(Resp't Ex. 4 at 9:25-11:20 [brackets added].)

## DISCUSSION

### I.   Existence of a Protected Liberty Interest

Respondent argues that the petition should be dismissed for want of subject matter jurisdiction because Petitioner has no federally protected liberty interest in parole under California Penal Code section 3041.  (Answer ¶ 4.)  Before reaching the merits of Petitioner's claim, the Court addresses Respondent's argument that Petitioner has no protected liberty interest in parole which would entitle him to the protections of due process at parole suitability hearings.

Respondent relies on In re Dannenberg, 34 Cal. 4th 1061 (2005), cert. denied, 546 U.S. 844 (2005), as authority for his contention that the California statute does not create a liberty interest in parole.  This argument has been rejected by the United States Court of Appeals for the Ninth Circuit.  See Sass, 461 F.3d at 1125 ("California inmates continue to have a liberty interest in parole after [Dannenberg].");  see also Board of Pardons v. Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1 (1979).  Thus, in accord with Sass, Petitioner was entitled to the protections of due process at his BPT hearing.  Furthermore, the Court has subject matter jurisdiction under 28 U.S.C. § 2254 to decide whether Petitioner's right to due process was violated by the BPT.

### II.   Due Process Claim

#### A.   Applicable Legal Standard

"In analyzing the procedural safeguards owed to an inmate under the Due Process clause, [a

7

United States District Court

For the Northern District of California

court] must look at two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural safeguards."  Biggs v. Terhune, 334 F.3d 910, 913 (9th Cir. 2003).  The second prong of this test is satisfied if (1) the inmate has been afforded an opportunity to be heard and, if denied parole, informed of the reasons underlying the decision and (2) "some evidence" supports the decision to grant or deny parole.  See Sass, 461 F.3d at 1129 (adopting some evidence standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)).

"To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence.  Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by the parole board.  Id. at 1128 (quoting Hill, 472 U.S. at 455-56).  The "some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the . . . board were without support or otherwise arbitrary.'"  Id. at 1129 (quoting Hill, 472 U.S. at 457).  The some evidence standard of Hill is clearly established law in the parole context for purposes of § 2254(d).  Sass, 461 F.3d at 1129.

Three Ninth Circuit cases provide the guideposts for applying the Hill "some evidence" standard on this point:  Biggs, Sass, and Irons v. Carey, No. 05-15275, slip op. 8335, 8344 (9th Cir. July 13, 2007), reh'g and reh'g en banc denied, Irons v. Carey, No. 05-15275, slip op. 14647 (9th Cir. November 6, 2007).  Biggs explained that the value of the criminal offense fades over time as a predictor of parole suitability:  "The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. . . .  A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation."  Biggs, 334 F.3d at 916-17.  Biggs upheld the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that "[o]ver time . . ., should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs's offense and prior conduct would

**United States District Court**
For the Northern District of California

1   raise serious questions involving his liberty interest in parole." Id. at 916.  Next came Sass, which

2   criticized the Biggs statements as improper and beyond the scope of the dispute before the court:

3   "Under AEDPA it is not our function to speculate about how future parole hearings could proceed."

4   Sass, 461 F.3d at 1129.  Sass determined that the parole board is not precluded from relying on

5   unchanging factors such as the circumstances of the commitment offense or the petitioner's pre-

6   offense behavior in determining parole suitability.  See id. (commitment offenses in combination

7   with prior offenses provided some evidence to support denial of parole at subsequent parole

8   consideration hearing).  Sass also put to rest any idea from Biggs that the commitment crime and

9   pre-offense behavior only support the initial denial of parole.  Recently, Irons determined that due

10  process was not violated by the use of the commitment offense and pre-offense criminality to deny

11  parole for a prisoner sixteen years into his seventeen-to-life sentence.  Irons emphasized that all

12  three cases (Irons, Sass and Biggs) in which the court had "held that a parole board's decision to

13  deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with

14  due process, the decision was made before the inmate had served the minimum number of years

15  required by his sentence."  Irons, No. 05-15275, slip op. 8449.  Interpreting this statement from Irons

16  to suggest that the offense can only be relied on until the minimum number of years has been

17  reached would suffer the same problem that Sass identified in Biggs:  it is not the holding of the

18  case.  The dicta in Biggs and Irons are speculative and do not determine when a denial of parole

19  based solely upon the commitment offense or pre-offense behavior violates due process.  Neither

20  logic nor Irons compel a decision that such reliance must cease when the prisoner reaches the

21  minimum number of years in his sentence, such as the fifteenth year of a fifteen-to-life sentence.

22       The upshot of these three cases is that the BPT can look at immutable events, such as the

23  nature of the conviction offense and pre-conviction criminality, to predict that the prisoner is not

24  currently suitable for parole even after the initial denial (Sass), but the weight to be attributed to

25  those immutable events should decrease over time as a predictor of future dangerousness as the

26  years pass and the prisoner demonstrates favorable behavior (Biggs and Irons).  Sass did not dispute

27  the principle that, other things being equal, a murder committed fifty years ago is less probative of a

28

9

**United States District Court**

For the Northern District of California

1   prisoner's current dangerousness than one committed ten years ago.  Not only does the passage of

2   time in prison count for something, exemplary behavior and rehabilitation in prison count for

3   something according to Biggs and Irons.  Hill's standard might be quite low, but it does require that

4   the decision not be arbitrary, and reliance on only the facts of the crime might eventually make for

5   an arbitrary decision.

6         What little guidance has come from the Supreme Court suggests that judicial review should

7   be extremely deferential to the original decisionmaker in the parole context.  In addition to the very

8   low evidentiary standard that Hill imposes, other Supreme Court comments suggest that the

9   judiciary should be quite mindful of the subjective and predictive nature of a parole board's decision.

10  See Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1, 13 (1979).  "No ideal,

11  error-free way to make parole-release decisions has been developed; the whole question has been

12  and will continue to be the subject of experimentation involving analysis of psychological factors

13  combined with fact evaluation guided by the practical experience of the actual parole

14  decisionmakers in predicting future behavior.  Our system of federalism encourages this state

15  experimentation."  Id.

16        **B.      Parole for Murderers in California**

17        California uses indeterminate sentences for most non-capital murderers, with the term being

18  life imprisonment and parole eligibility after a certain minimum number of years.  A first degree

19  murder conviction yields a minimum term of twenty-five years to life and a second degree murder

20  conviction yields a base term of fifteen years to life imprisonment.  See Dannenberg, 34 Cal. 4th at

21  1078; CAL. PENAL CODE § 190.  The upshot of California's parole scheme described below is that a

22  release date normally must be set unless various factors exist, but the "unless" qualifier is so great

23  that parole is a rarity rather than the norm for murderers.

24

25        A BPT panel meets with an inmate one year before the prisoner's minimum eligible release

26  date "and shall normally set a parole release date . . . .  The release date shall be set in a manner that

27  will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to

28  the public, and that will comply with the sentencing rules that the Judicial Council may issue and

10

any sentencing information relevant to the setting of parole release dates." CAL. PENAL CODE § 3041(a). Significantly, that statute also provides: The panel shall set a release date,

> unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.

Id. § 3041(b).

One of the implementing regulations, Title 15 of the California Code of Regulations § 2401 provides: "A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public." The regulation also provides that "[t]he panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." CAL. CODE REGS. tit. 15, § 2402(a).

In making its determination, the parole board may consider "[a]ll relevant, reliable information available," including,

> the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in finding of unsuitability.

Id. § 2402(b).

Circumstances tending to show unsuitability for parole include the nature of the commitment offense, and consideration of whether "[t]he prisoner committed the offense in an especially heinous, atrocious or cruel manner." Id. § 2281(c). This includes consideration of the number of victims,

11

United States District Court

For the Northern District of California

whether "[t]he offense was carried out in a dispassionate and calculated manner," whether the victim was "abused, defiled or mutilated during or after the offense," whether "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and whether "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." Id.

Other circumstances tending to show unsuitability for parole are a previous record of violence, an unstable social history, previous sadistic sexual offenses, a history of severe mental health problems related to the offense, and serious misconduct in prison or jail. See id.

Circumstances tending to support a finding of suitability for parole include no juvenile record, a stable social history, signs of remorse, that the crime was committed as a result of significant stress in the prisoner's life, a lack of criminal history, a reduced possibility of recidivism due to the prisoner's present age, that the prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release, and that the prisoner's institutional activities indicate an enhanced ability to function within the law upon release. See id. § 2281(d).

The regulations also contain a matrix of suggested base terms that prisoners with indeterminate sentence should serve before they are released on parole. The matrix provides three choices of suggested "base terms" for several categories of crimes. See CAL. CODE REGS. tit. 15, § 2403. If, as in Petitioner's case, the base offense is two counts of first-degree murder with the use of a dangerous weapon (firearm), the matrix of base terms ranges from a low of twenty-eight, twenty-nine, or thirty years, to a high of thirty, thirty-one, or thirty-two years, depending on some of the facts of the crime.[3] See id. § 2403(b). Although the matrix is to be used to establish a base term, this occurs only once the prisoner has been found suitable for parole. See id. § 2403(a).

The statutory scheme places individual suitability for parole above a prisoner's expectancy in

---

[3] One axis of the matrix concerns the relationship between murderer and victim and the other axis of the matrix concerns the circumstances of the murder. The choices on the axis for the relationship of murderer and victim are "participating victim," "prior relationship," "no prior relationship," and "threat to public order or murder for hire." The choices on the axis for the circumstances of the murder are "indirect," "direct or victim contribution," "severe trauma," or "torture." Each of the choices are further defined in the matrix. See CAL. CODE REGS. tit. 15, § 2403(b).

**United States District Court**

For the Northern District of California

1    early setting of a fixed date designed to ensure term uniformity.  <u>Dannenberg</u>, 34 Cal. 4th at 1070-

2    71.

3
>    While subdivision (a) of section 3041 states that indeterminate life (i.e., life-
>    maximum) sentences should "normally" receive "uniform" parole dates for
4    similar crimes, subdivision (b) provides that this policy applies "*unless* [the
>    Board] determines" that a release date cannot presently be set because the
5    particular offender's crime and/or criminal history raise "*public safety*"
>    concerns requiring further indefinite incarceration.  (Italics added.)  Nothing
6    in the statute states or suggests that the Board must evaluate the case under
>    standards of term uniformity before exercising its authority to deny a parole
7    date on the grounds the particular offender's criminality presents a *continuing
>    public danger*.

8

9    <u>Id.</u> at 1070 (emphasis, brackets and parenthesis in original).  Indeed, the very regulation that

10   includes the matrix states that "[t]he panel shall set a base term for each life prisoner <u>who is found</u>

11   <u>suitable for parole</u>."  C<span style="font-variant:small-caps">AL</span>. C<span style="font-variant:small-caps">ODE</span> R<span style="font-variant:small-caps">EGS</span>. tit. 15, § 2403(a) (emphasis added).  "[T]he Board,

12   exercising its traditional broad discretion, may protect public safety <u>in each discrete case</u> by

13   considering the dangerous implications of a life-maximum prisoner's crime individually."

14   <u>Dannenberg</u>, 34 Cal. 4th at 1071 (emphasis added).  The California Supreme Court's determination

15   of state law is binding in this federal habeas action.  <u>See</u> <u>Hicks v. Feiock</u>, 485 U.S. 624, 629 (1988);

16   <u>Sandstrom v. Montana</u>, 442 U.S. 510, 516-17 (1979).

17          The California Supreme Court has determined that the facts of the crime can alone support a

18   sentence longer than the statutory minimum even if everything else about the prisoner is laudable.

19   "While the board must point to factors beyond the minimum elements of the crime for which the

20   inmate was committed, it need engage in no further comparative analysis before concluding that the

21   particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release."

22   <u>Dannenberg</u>, 34 Cal. 4th at 1071; <u>see also</u> <u>In re Rosenkrantz</u>, 29 Cal. 4th 616, 682-83 (2002), <u>cert.</u>

23   <u>denied</u>, 538 U.S. 980 (2003) ("[t]he nature of the prisoner's offense, alone, can constitute a sufficient

24   basis for denying parole" but might violate due process "where no circumstances of the offense

25   reasonably could be considered more aggravated or violent than the minimum necessary to sustain a

26   conviction for that offense").  Granted the Ninth Circuit has stated that in some cases, "indefinite

27   detention based solely on an inmate's commitment offense, regardless of the extent of his

28

1    rehabilitation, will at some point violate due process, given the liberty interest in parole that flows

2    from the relevant California statutes."  Irons, 479 F.3d at 665; see also Biggs, 334 F.3d at 917 n.5.

3    **C.**        **Analysis**

4             **1.**        **Opportunity to Be Heard and Reasons for Denial**

5             Having stated that California inmates still maintain a liberty interest, the Court analyzes the

6    next prong of the Biggs test.  Under the second prong of the Biggs test, the first question pertains to

7    whether Petitioner was given an opportunity to be heard and whether he was given reasons for the

8    parole denial.  See Biggs, 334 F.3d at 913; Sass, 461 F.3d at 1126; Greenholtz, 442 U.S. at 16.

9             Petitioner fully participated in his parole hearing as evidenced by the transcript of the

10   hearing.  (Resp't Ex. 4.)  Throughout the hearing, Petitioner was given the opportunity to make

11   comments or objections in response to the BPT's statements, clarify any misunderstandings and give

12   statements regarding his parole eligibility.  (Id.)  In addition, the BPT laid out detailed reasons for

13   denying Petitioner parole, which are discussed further below.  The Court finds that the BPT satisfied

14   the requirements for due process under this prong.

15            **2.**        **"Some Evidence" Standard**

16            The next question is whether there was some evidence to support the BPT's decision to deny

17   parole.  What little guidance has come from the Supreme Court suggests that the "some evidence"

18   standard is extremely deferential to the original decision-maker.  See Hill, 472 U.S. at 454

19   (examination of the entire record is not required nor is an independent assessment of the credibility

20   of witnesses or weighing of the evidence; the relevant question is whether there is any evidence in

21   the record that could support the conclusion reached by the decision-maker).  Moreover, the

22   Supreme Court's comments suggest that the judiciary should be quite mindful of the subjective and

23   predictive nature of a parole board's decision.  See Greenholtz, 442 U.S. at 13 ("No ideal, error-free

24   way to make parole-release decisions has been developed; the whole question has been and will

25   continue to be the subject of experimentation involving analysis of psychological factors combined

26   with fact evaluation guided by the practical experience of the actual parole decisionmakers in

27   predicting future behavior.").

28            **a.**        **The 2002 Parole Hearing**

United States District Court
For the Northern District of California

14

At the 2002 parole suitability hearing, the BPT found that Petitioner was "not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison." (Resp't Ex. 4 at 52:6-9.)   Below are the factors the BPT considered in making its determination to deny parole:

### (1)   The Commitment Offense

The panel found some evidence supporting its determination of Petitioner's unsuitability for parole based on a finding that:

> The offense was carried out in an especially cruel and callous manner.  Two victims were attacked and killed in two separate incidents.  The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.  The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.  And the motive for the crime was very trivial in relationship to the offense.

(Id. at 52:9-18.)

In deciding that this was a two-year denial, the BPT reiterated the violent nature of the crime and the manner in which it was carried out:

> [T]he hearing Panel finds that it is not reasonable to expect that parole would be granted at a hearing during the following two years.  And, specifically, for the way that the crime was committed in that you killed one woman in a home, took another to a restaurant, and ended up murdering her after her restaurant was robbed.  Two of the victims were killed and the offense was carried out in a very dispassionate and calculated manner and in a manner which demonstrates an exceptionally callous disregard for human suffering and the motive for the crime was very trivial in relation to the offense.

(Id. at 56:25-57:12 [brackets added].)

While the BPT did commend Petitioner for his educational achievements, future parole plans, and receiving positive support from prison staff, it exercised its authority under state law to make a finding of unsuitability for parole based on the commitment offense.  (Resp't Ex. 4 at 55:9-11, 55:22-56:22); see Dannenberg, 34 Cal. 4th at 1071; see also Rosenkrantz, 29 Cal. 4th at 682-83.

### (2)   Petitioner's Psychological Report

The BPT also relied on Petitioner's most recent psychological report in support of its decision to find him unsuitable for parole.  (Resp't Ex. 4 at 53:8-13.)  This report was authored

United States District Court

For the Northern District of California

by forensic psychologist Dr. Erich Rueschenberg on May 23, 2002. (Pet'r Ex. F.) Dr. Rueschenberg stated in his report that Petitioner "falls into a category that reflects a moderate risk of violence in the community." (Id. at 6.) Additionally, the BPT acknowledged Petitioner's psychological report prepared by Dr. Les Carr in 1999, which indicated that Petitioner's Antisocial Personality Disorder is "improving," and that Petitioner's "violence potential is judged to be average for this population of inmates." (Resp't Ex. 4 at 53:13-21.) The BPT stated that Petitioner's violence potential as observed by Dr. Carr "is not acceptable as comparing [Petitioner] to other inmates as to releasing him to the community." (Id. at 53:21-23.)

### (3)    Need for Further Observation and Evaluation

The BPT examined factors of suitability that would support parole, i.e., that Petitioner had plans for where to live and work if released (id. at 26:24-30:22), that he completed an Associate in Arts (AA) degree and his x-ray technician certification (id. at 55:25-26), and that his prison behavior had been exceptional because he has received exceptional work reports and participated in numerous religious and self-help programs (id. at 55:26-56:22). However, the BPT relied upon Petitioner's 1994 evaluation report, which indicated the difficulty of "predict[ing] the degree of danger outside of the prison setting of someone who has been incarcerated for the past 20 years and essentially all of his adult life." (Id. at 54:21-25.) Furthermore, the evaluation report stated that Petitioner "will continue to need some sort of external structure and support to help control his behaviors and compensate for controls that may not have been internalized earlier in his life." (Id. at 55:2-6.) The BPT determined that "a longer period of observation and evaluation of the prisoner is required before the Board should find the prisoner is suitable for parole." (Id. at 57:16-19.)

### (4)    Opposition to Parole

The Deputy District Attorney and the next of kin of one of the victims opposed Petitioner's suitability for parole. (Id. at 55:15-22.)

Deputy District Attorney Richard Sachs stated:

16

1
2
3
4
5
6

> I attended a hearing in 1997 on this individual and when he spoke about the offense, we asked him how he felt about it and whether the victim had begged for her life as he drove her out to execute her, speaking of Ms. Northrup. And he became very angry when discussing this subject and this is still an area that's completely unexplored as to his feelings for the victim's, his remorse, his attitude toward the offense currently, his insight to the offenses, all completely unexplored and all potentially very explosive. And I would add one other factor which is that psychological reports whether he has one in this batch that says he's a low degree of threat is not a reliable predictor of his future dangerousness in an uncontrolled environment and in a free society.

7

(Id. at 40:11-27.)

8
9
10
11
12

The grandson of Mrs. Northrop addressed the BPT and stated, "two women were brutally slain, two elderly women that posed no threat to this man, no physical threat to this man at all." (Id. at 47:3-6.) Moreover, he added that he would return every year to protest Petitioner's parole. (Id. at 47:13-16.) The daughter of the same victim also spoke before the BPT, stating:

13
14
15

> Murder is a word I've lived with for the last 30 years. I don't believe that he should ever be released. He may do it again. We don't know what he's going to do when he gets out. He took a woman from me, from my family. She was an outstanding mom and to die by somebody sticking a gun at her head.

16

(Id. at 48:3-49:22.)

17

### (5) Conclusion

18
19
20
21
22
23
24
25
26
27
28

As noted supra, the panel identified the fact-specific reasons to support its conclusion that Petitioner was unsuitable for parole. Contrary to Petitioner's arguments, the record shows that the BPT's findings were supported by some evidence. The records show that the BPT conducted a thorough review and consideration of Petitioner's individual factors tending to show unsuitability and suitability for parole. Indeed, the BPT recognized and commended Petitioner's exceptional work reports and exemplary prison behavior, participation in educational programs, vocational training and certification, and parole plans. Nevertheless, the BPT found that Petitioner was not yet suitable for parole because "the positive aspects of [Petitioner's] behavior do not outweigh the factors of unsuitability." (Id. at 56:22-24.) Rather, the BPT concluded that before Petitioner could be found suitable for parole, a longer period of observation and evaluation is required. (Id. at 57:16-19.)

**United States District Court**
For the Northern District of California

1   Having reviewed the facts of the crime as recited by the BPT and the other reasons

2   stated for finding Petitioner ineligible for parole, the Court finds that there was some evidence

3   in the record to support the BPT's decision.  See Hill, 472 U.S. at 455-56.

4   **b.   Other Arguments**

5   Petitioner makes two additional arguments:  (1) the BPT's denial of parole based on his

6   commitment offense violates Biggs, and (2) the BPT's refusal to set a parole date results in

7   imposition of punishment disproportionate to standards established under the state's sentencing

8   matrix.  The Court finds that these arguments must fail.

9   **(1)   _Biggs_ Argument**

10   Petitioner argues that the BPT "relies heavily on Petitioner's crime as the primary

11   reason the Board denied parole." (Traverse at 6.)  Moreover, he claims that the BPT's "primary

12   objective should not have been to focus on the crime but instead on Petitioner's rehabilitation."

13   (Id.)  He cites Biggs for the proposition that "continued reliance on the circumstances of the

14   offense runs contrary to the rehabilitative goals espoused by the prison system and could result

15   in a due process violation." (Pet. at 21-22.)

16   In Biggs, the prisoner was serving a sentence of twenty-five years to life following a

17   1985 first degree murder conviction.  In the case before the Ninth Circuit, Biggs challenged the

18   1999 decision by the BPT finding him unsuitable for parole despite his record as a model

19   prisoner.  Id. at 913.  While the Ninth Circuit rejected several of the reasons given by the BPT

20   for finding Biggs unsuitable, it upheld three:  (1) the commitment offense involved the murder

21   of a witness, (2) the murder was carried out in a manner exhibiting a callous disregard for the

22   life and suffering of another, and (3) Biggs could benefit from therapy.  Id.  The Ninth Circuit

23   found no due process violation and upheld the prisoner's parole denial based solely on the

24   nature of the crime and conduct before incarceration.  Id. at 916.

25   Petitioner's reliance on Biggs to support his argument that denial of suitability in his

26   individual case is misplaced.  First, although the Ninth Circuit in Biggs cautioned the BPT that

27   continued reliance in future parole suitability hearings on the commitment offense may violate

28

18

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

due process, id. at 916-17, it did so only in dicta.  Not only is it not Supreme Court law, but the Ninth Circuit has also recently criticized the statements in Biggs as being improper and beyond the scope of the dispute before the court.  The Ninth Circuit stated, "Under AEDPA, it is not our function to speculate about how future parole hearings could proceed."  Sass, 461 F.3d at 1129.  Sass confirmed that "evidence of [a prisoner's] prior offenses and the gravity of his convicted offenses constitute some evidence to support the [b]oard's decision."  Id.  In light of Sass, the BPT's consideration of Petitioner's conviction offense, prior criminal conduct, lack of remorse and other factors satisfies the minimal "some evidence" requirement.  Secondly, it must be noted that the BPT did not rely solely on the commitment offense in denying Petitioner suitability for parole.  The BPT relied on several factors, including Petitioner's underlying offense, his psychological evaluation reports, his need for further observation and evaluation, as well as statements opposing his parole made by the District Attorney and the next of kin of one of the victims.

Accordingly, the Court finds no merit to Petitioner's claim because he cannot rely on the dicta in Biggs to demonstrate that the BPT violated his due process rights by denying him parole suitability.

### (2)      Matrix Argument

Petitioner further claims that the BPT violated his right to due process because he is overdue for release under the BPT's sentencing matrix.  (Pet. at 14.)

As explained previously, the matrix is not consulted and a term is not set under state law unless and until the prisoner is found suitable for parole.  See Dannenberg, 34 Cal. 4th at 1070-71; CAL. CODE REGS. tit. 15, § 2403(a).  Petitioner was not found suitable for parole; therefore, the matrix did not need to be consulted.  Moreover, the BPT determined that Petitioner was unsuitable for parole after considering the factors outlined above.  Thus, Petitioner's claim that there was "no real evidence" to deny him parole is unavailing.  Even if Petitioner had a due process right in having state law followed by the parole authority, state law was followed by the BPT.  Accordingly, Petitioner's claim is without merit.

**United States District Court**

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

c.      <u>Superior Court Denial</u>

In denying Petitioner's state habeas petition, the Marin County Superior Court held that

the BPT did not err in determining Petitioner's unsuitability for parole:

> [The BPT] had good reason to conclude that Petitioner would pose an
> unreasonable risk of danger to society or a threat to public safety if released
> from prison.  The commitment offense itself was carried out in an especially
> cruel manner:  Petitioner murdered one victim; he took another victim to a
> restaurant and murdered her after her restaurant was robbed.  Petitioner has an
> unstable social history; and the psychological reports suggest that he is still a
> risk to public safety if released.  The San Diego County District Attorney and
> the victim's family oppose parole.

(Resp't Ex. 2 at 2-3.)

Because the superior court's decision is the last reasoned decision regarding Petitioner's

challenge to the BPT's denial of his parole, the Court will review the decision under 28 U.S.C.

§ 2254(d).  <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803-04 (1991); <u>Barker v. Fleming</u>, 423 F.3d 1085,

1091-92 (9th Cir. 2005), <u>cert. denied</u>, 126 S. Ct. 2041 (2006).  Having reviewed the facts of the crime

as recited by the BPT and state court, and the other reasons stated for finding Petitioner ineligible for

parole, the Court does not find evidence to refute the fact that the BPT's decision was supported by

some evidence.  The Court concludes that the state court's decision to uphold the BPT's denial of

parole was not based on an unreasonable determination of the facts in light of the evidence presented

in the state court proceeding, 28 U.S.C. § 2254(d)(2), nor was it contrary to, or an unreasonable

application of, clearly established federal law, <u>id.</u> § 2254(d)(1).

Accordingly, Petitioner's due process challenge to the denial of parole by the BPT is

DENIED.

**III.      <u>Ex Post Facto Claim Based on Failure to Adhere to the Sentencing Matrix</u>**

Petitioner argues that his life sentence with the possibility of parole after seven years

has been altered by the BPT in violation of the Ex Post Facto Clause.  In effect, Petitioner

claims that his sentence has been changed to a life sentence with the possibility of parole after

twenty-five years or a life sentence without the possibility of parole.  (Pet. at 33.)

"The <u>ex post facto</u> prohibition forbids the Congress and the States to enact any law

20

United States District Court

For the Northern District of California

1    which imposes a punishment for an act which was not punishable at the time it was committed;

2    or imposes additional punishment to that then prescribed."  <u>Connor v. Estelle</u>, 981 F.2d 1032,

3    1033 (9th Cir. 1992) (internal citations omitted).  "In accord with these purposes . . . two

4    critical elements must be present for a criminal or penal law to be <u>ex post facto</u>:  it must be

5    retrospective, that is, it must apply to events occurring before its enactment, and it must

6    disadvantage the offender affected by it."  <u>Weaver v. Graham</u>, 450 U.S. 24, 29 (1981).

7          Petitioner does not claim that a new law is being applied retroactively to his case.

8    There are no allegations that the State has changed the formula to calculate parole eligibility or

9    suitability as applied to Petitioner.  <u>See</u> <u>Nulph v. Faatz</u>, 27 F.3d 451, 455-56 (9th Cir. 1994)

10   (the <u>ex post facto</u> prohibition forbids the States from enhancing the measure of punishment by

11   significantly reducing a prisoner's opportunity to shorten his prison term by altering the

12   "substantive formula" used to calculate parole eligibility or suitability).  The facts show that

13   Petitioner's earliest eligible parole date was November 11, 1978, and he had sixteen previous

14   parole hearings prior to the 2002 hearing.  (Pet. at 3.)  The Court finds that there is no

15   cognizable claim for an <u>ex post facto</u> violation based on the Petitioner's allegations.

16         Accordingly, Petitioner's <u>ex post facto</u> claim is without merit.

17                                     **<u>CONCLUSION</u>**

18         For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.  The

19   Clerk of the Court shall enter judgment in accordance with this Order, terminate all pending

20   motions, and close the file.

21         IT IS SO ORDERED.

22   DATED:  12/10/07

23                                     _Saundra B Armstrong_____
                                       SAUNDRA BROWN ARMSTRONG
24                                     United States District Judge

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF CALIFORNIA

THRASHER,

         Plaintiff,

  v.

BROWN et al,

         Defendant.

_____/

Case Number: CV05-01840 SBA

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on December 10, 2007, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Eric La Von Thrasher B-37948
San Quentin State Prison
San Quentin,  CA 94964

Dated: December 10, 2007

                        Richard W. Wieking, Clerk
                        By: LISA R CLARK, Deputy Clerk

**United States District Court**
For the Northern District of California